# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

FIRST 100, LLC, a Nevada limited liability
company; and 1ST ONE HUNDRED
HOLDINGS, LLC, a Nevada limited liability
company,

              Plaintiffs,

     vs.

JOHN LASALA, an individual; IAN HAFT,
an individual; JAMIE MAI, an individual;
CHA SOLUTIONS INC., a foreign
corporation; CORNWALL CAPITAL
MANAGEMENT LP, a foreign corporation;

              Defendants.

Case No.: 2:14-cv-01460-GMN-CWH

### ORDER

---

On April 24, 2017, the Court conducted a one-day bench trial relative to the dispute between Plaintiffs First 100, LLC and 1st One Hundred Holdings, LLC (collectively, "First 100" or Plaintiffs) and Defendant John Lasala ("Lasala" or "Defendant").[1] The Court, having read and considered the parties' briefings, testimony and documents admitted into the record, and oral arguments of counsel, and for good cause appearing, makes the following findings of facts and conclusions of law.

## FINDINGS OF FACT[2]

1. Plaintiff First 100 was established on April 10, 2012, for the purpose of real estate investment through acquiring delinquent account receivables from homeowners

---

[1] All other co-defendants were voluntarily dismissed on January 1, 2015. (ECF No. 23).

[2] To the extent any Finding of Fact should be properly designated a Conclusion of Law, it shall be deemed a Conclusion of Law. To the extent any Conclusion of Law should properly be designated a Finding of Fact, it shall be deemed a Finding of Fact.

associations (*i.e.* "HOAs") in Nevada, Florida, and other states. (First Revised Joint Pretrial Order Stipulated Facts ("JPO") 3:8–10, ECF No. 65).

2.     Thereafter, Plaintiff 1st One Hundred was established on December 3, 2013, as a holding company for First 100. (JPO 3:11–12).

3.     Defendant John Lasala ("Lasala") served as Plaintiffs' chief legal officer between approximately December 13, 2013, and May 12, 2014, and is a licensed attorney in the State of New York. (JPO 3:13); (Jay Bloom ("Bloom") Trial Test., ECF No. 100)[3]; (*see also* New York State Attorney Detail, Trial Ex. 3).[4]

4.     The Court finds Lasala's testimony was not credible.  He contradicted himself, and his explanations were not reasonable.   This credibility determination was taken into consideration to make these findings of fact.

5.     Lasala did not sign Plaintiff's Operating Agreement. (*See* Operating Agreement, Trial Ex. 4).  At trial, Lasala questioned Bloom as to the signing of the Operating Agreement and Bloom's testimony regarding Lasala's offered and accepted employment package.  Lasala asked whether Plaintiff's offer of employment to him would have been memorialized in writing.  Bloom explained that Lasala, as CLO, was responsible for drafting such documents as employment offers and the Operating Agreement, and ensuring members signed the Operating Agreement.  Lasala conceded during trial that he was an employee of Plaintiff. (Lasala Trial Test., ECF No. 100).  The Court finds Bloom's testimony credible regarding the employment

---

[3] The parties did not request a transcript from the bench trial.  As such, for citations to trial testimony, the Court can only cite to the name of the person who testified.

[4] All of Plaintiff's proposed trial exhibits (ECF No. 80-1) were admitted at trial, along with two additional exhibits: Exhibit 15, an email from Erika Twesme to Joseph Gutierrez, Jason Maier, and Luis Ayon, with Lasala as a CC recipient, and Exhibit 16, email correspondence between Lasala and Chris Wood ("Wood"), Senior Vice President of Business Development for FirstService Residential, along with email correspondence between Lasala, Wood, and Aaron Bull ("Bull") with an attachment entitled "<CHA Solutions Teaser.pdf>" a one-page document stating: "Nevada HOA Partnership Plan," which was admitted separately as Trial Exhibit 11.  When the Court cites to Trial Exhibits, the numbers will correspond with Plaintiff's proposed trial exhibits.  Lasala did not file a list of proposed trial exhibits, and he did not admit any exhibits at trial.  Therefore, all cited exhibits refer to Plaintiff's exhibits.

package Lasala was offered and accepted, including a salary and 2% equity under a three year vesting schedule. (Bloom Trial Test.). Lasala also acknowledged his duty of confidentiality to Plaintiff during trial. (Lasala Trial Test.).

6.  The 1st One Hundred Operating Agreement requires all members to hold in strict confidence any information received regarding 1st One Hundred, as follows:

> 3.14 CONFIDENTIAL INFORMATION. The Members acknowledge that from time to time, they may receive information from the Manager or other Persons regarding the Company or Persons with which it does business. Each Member shall hold in strict confidence any information it receives regarding the Company… and may not disclose it to any person other than to another Member or a Manager, except for disclosures: (i) compelled by law (but the Member must notify the Manager promptly of any request for that information, before disclosing it, if practicable); (ii) to advisers or representatives of the Member or Persons to which that Member's Membership Interest may be Disposed as permitted by this Operating Agreement, but only if the recipients have agreed to be bound by the provisions of this Section; or (iii) of information that Member also has received from a source independent of the Company that the Member reasonably believes obtained that information without breach of any obligation of confidentiality. The Members acknowledge that breach of the provisions of this Section may cause irreparable injury to the Company for which monetary damages are inadequate, difficult to compute, or both. Accordingly, the Members agree that the provisions of this Section may be enforced by specific performance. The Members acknowledge that the Manager from time to time may determine, due to contractual obligations, business concerns, or other considerations, that certain information regarding the business, affairs, properties, and financial condition of the Company should be kept confidential and not provided to some or all other Members, and that it is not just or reasonable for those Members to examine or copy that information.

(Operating Agreement at 5).

7.  Pursuant to Section 1.16 of the Operating Agreement, a "member" is defined therein as "any person executing this Operating Agreement as of the date of this Operating Agreement as a Member, or hereafter admitted to the Company as a Member as provided in

this Operating Agreement, but does not include any Person who has ceased to be a Member in the Company." (*Id.* at 2).

8.    As chief legal officer, Lasala was entrusted with drafting, reviewing and executing important documents for Plaintiffs and their investors, which contained detailed information pertaining to Plaintiffs' corporate structure, strategy, financial statements, value, and other extremely sensitive proprietary information, which was not accessible to the public. (Bloom Trial Test.); (Email Introduction, Trial Ex. 15) (email from Erika Twesme "Twesme" to Joseph Gutierrez, Jason Maier, and Luis Ayon with CC to Lasala introducing Lasala as her "colleague").

9.    The Court does not find that Lasala was a member of Plaintiffs. While Lasala was involved with drafting Operating Agreement, to be a member of it specifically requires execution. Without a signature or even a signature block, the Court cannot find that Lasala executed the Operating Agreement to become a member.

10.    By Lasala's involvement with the drafting of the Operating Agreement, however, he was privy to confidential and proprietary information.

11.    Lasala also oversaw and participated in the preparation of First 100's employee manual (the "Employee Manual"). (Bloom Trial Test.); (Employee Manual, Trial Ex. 5). No evidence was provided at trial that Lasala signed the Employee Manual, but he helped to draft it. (Bloom Trial Test.).

12.    Pursuant to the Employee Manual, employees owed the company a duty of non-disclosure and confidentiality as follows:

> Upon accepting employment with First 100, LLC, you were asked to sign a Confidentiality Agreement, which generally provided that you will not disclose or use any First 100, LLC confidential information, either during or after your employment. We sincerely hope that our relationship will be long-term and mutually rewarding. However, your employment with First 100, LLC assumes an obligation to maintain confidentiality, even after you leave our employ.

Additionally, our clients and suppliers entrust First 100, LLC with important information relating to their business. The nature of this relationship requires maintenance of confidentiality. In safeguarding the information received, First 100, LLC earns the respect and further trust of our clients and suppliers.

If you are questioned by someone outside the company or your department and you are concerned about the appropriateness of giving them certain information, you are not required to answer. Instead, as politely as possible, refer the request to your manager. No one is permitted to remove or make copies of any First 100, LLC records, reports or documents without prior management approval. Disclosure of confidential information could lead to **immediate** termination, as well as other possible legal action.

(Employee Manual at 15).

13.     While no evidence was produced at trial to indicate that Lasala signed the acknowledgment in the Employee Manual, the Court finds that he was on notice of the non-disclosure and confidentiality provisions and that Plaintiffs wanted their business information held in strict confidence because of his involvement in its drafting and subject to it as an employee of Plaintiffs. (*See* Bloom Trial Test.). At no point did Lasala express any concerns or objections to the terms of the Employee Manual, in writing or otherwise, because no confidential information would have been disclosed to him had he objected. (*Id.*). Regardless of his signature or lack thereof, as an employee of Plaintiffs, these provisions applied to Lasala and he was bound by them.

14.     Lasala owed fiduciary duties to Plaintiffs as Plaintiffs' chief legal officer. (*Id.*).

15.     Lasala acted as the primary point of contact for the Cornwall Defendants ("Cornwall") throughout their business dealings with Plaintiffs, and in anticipation of the meeting and possible transaction, Lasala drafted a confidentiality agreement (the "Confidentiality Agreement") for the Cornwall to sign. (Bloom Trial Test.); (Confidentiality Agreement, Trial Ex. 7). Lasala also made the initial introduction between Cornwall and Plaintiffs. (Lasala Trial Test.).

16. At the meeting with Plaintiffs' representatives on February 6, 2014, Defendant Ian Haft ("Haft"), on behalf of Cornwall, executed the Confidentiality Agreement. (*Id.* at 11) (showing Haft's signature).

17. In an effort to further business relations among Plaintiffs and Cornwall, Cornwall initiated a due diligence process and requested information pertaining to Plaintiffs' finances, legal involvement, investment performance, sales and marketing, clients and suppliers, compensation, background of management, and other related material. (Bloom Trial Test.).

18. On or about February 7, 2014, Plaintiffs provided the Cornwall access to Plaintiffs' electronic data room, which contained a myriad of confidential and propriety information, including work product, trade secrets, client lists, corporate relationships, and other such sensitive information. (JPO 3:22–23); (Bloom Trial Test.).

19. Lasala drafted and delivered extensive responses to the Cornwall's due diligence requests, which contained additional confidential and proprietary information. (JPO 3:24–25).

20. On or about March 7, 2014, the Term Sheet for the business transaction between Plaintiffs and Cornwall was signed and executed. (Final Term Sheet, Trial Ex. 8).

21. Cornwall also signed and executed a letter of intent on or about March 10, 2014, which detailed the pertinent terms and conditions of the proposed bridge loan to Plaintiffs in the amount of $6,000,000.00. (Letter of Intent, Trial Ex. 9).

22. Plaintiffs wholly believed that Cornwall would deliver on their loan agreement, and in reliance on the previous representations and Letter of Intent from Cornwall, Plaintiffs turned down funding in the amount of approximately $6,000,000.00 from non-party Full Circle Capital Corporation. (Bloom Trial Test.). Cornwall's Letter of Intent had an exclusivity provision, so Plaintiffs could not accept multiple partners. (*Id.*); (*see also* Letter of Intent at 4).

23. Although the Letter of Intent did not oblige Cornwall to fund the loan, the Letter dictated that "Cornwall Capital shall have the right in its sole discretion to reject Applicant's

application for the Loan on the basis of its due diligence investigation by written notice to Applicant, Borrower and Principals." (Letter of Intent at 6).

24. Plaintiffs had no reason to believe that Cornwall would not deliver on their promises to act in good faith to close the transaction. (Bloom Trial Test.).

25. However, shortly thereafter, Cornwall reneged on their commitment to finance Plaintiffs without providing any explanation or justification for their actions. (*Id.*).

26. Additionally, Cornwall retained all of Plaintiffs' confidential documents provided during the due diligence process, including draft pleadings, legal strategies, supporting non-public documents, client lists, and other such privileged information. (*See* Cease & Desist Letters at 7, Trial Ex. 12); (Cornwall Resp. to Cease & Desist, Trial Ex. 14).

27. At the end of April 2014, Lasala stopped communicating with Plaintiffs and effectively deserted his position as Plaintiffs' chief legal officer. (JPO 3:26–27).

28. Plaintiffs received formal resignation from Lasala, who was officially terminated on May 12, 2014. (*Id.* 3:28)

29. In early August 2014, Plaintiffs discovered that Lasala had partnered with Cornwall and his former classmate Aaron Bull ("Bull") to establish a company with the very same business model employed by Plaintiffs.

30. Corporate Defendant CHA Solutions Inc. ("CHA") was formally incorporated in Delaware and registered by Defendants on or about May 30, 2014, approximately one month after Lasala ceased all communication with Plaintiffs and about two months after Cornwall backed out of its agreement with Plaintiffs. (CHA Business Entity Details in Delaware ("CHA Incorporation Details"), Trial Ex. 10); (Bloom Trial Test.).

31. Plaintiffs discovered the existence of CHA through First Service Residential ("First Service"), an HOA management company with whom Plaintiffs conducted business. (Bloom Trial Test.).

32.     First Service informed Plaintiffs that Lasala had contacted them and requested a meeting to start a business similar to that of Plaintiffs. (*Id.*).

33.     CHA's corporate structure, strategy, market, function and purpose is substantially similar if not identical to that of Plaintiffs. (Bloom Trial Test.); (Chris Wood ("Wood") Trial Test., ECF No. 100).

34.     Wood worked at First Service, but he formerly worked for Plaintiffs during a time that overlapped with Lasala.  Lasala and Bull contacted Wood in June and August of 2014 about setting up a meeting with First Service to discuss future opportunities with CHA. (Email Correspondences, Trial Ex. 16).

35.     Lasala abused his role as Plaintiffs' chief legal officer and obtained Plaintiffs' confidential information in an effort to establish a competing business.

36.     Lasala breached numerous fiduciary duties during his time as Plaintiffs' chief legal officer and following his resignation of the position.

37.     Lasala disclosed Plaintiffs' confidential information to third parties for his own pecuniary interest.

38.     Lasala utilized Plaintiffs' client lists and business contacts by claiming an affiliation with Cornwall Capital.

39.     Lasala contacted Plaintiffs' clients and business contacts in an effort to gain business for CHA.

40.     Plaintiffs' damages have been limited due to Cornwall agreeing to destroy First 100's confidential information. (*See* Cornwall Resp. to Cease & Desist).

41.     Additionally, the actions of Lasala were willful, wanton and malicious, entitling Plaintiffs to an award of punitive damages against Lasala.

# CONCLUSIONS OF LAW

Based on the foregoing Findings of Fact, the Court enters the following Conclusions of Law:

1.    Lasala misappropriated Plaintiffs' trade secrets.

2.    In Nevada, the elements required for pleading a cause of action for misappropriation of trade secrets include: (1) a valuable trade secret; (2) misappropriation of the trade secret through use, disclosure, or nondisclosure of use of the trade secret; and (3) the requirement that the misappropriation be wrongful because it was made in breach of an express or implied contract or by a party with a duty not to disclose. *Kaldi v. Farmers Ins. Exch.*, 21 P.3d 16, 23 (Nev. 2001).

3.    According to Nevada's Uniform Trade Secrets Act, a trade secret is defined within as information not readily available to the public, which "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Nev. Rev. Stat. § 600A.030(5)(b). Thus, the "[a]ctual or threatened misappropriation [of a trade secret] may be enjoined." Nev. Rev. Stat. § 600A.040(1). In determining whether information is a trade secret, the Nevada Supreme Court has held that factors to be considered include:

> (1) the extent to which the information is known outside of the business and the ease or difficulty with which the acquired information could be properly acquired by others; (2) whether the information was confidential or secret; (3) the extent and manner in which the employer guarded the secrecy of the information; and (4) the former employee's knowledge of customer's buying habits and other customer data and whether this information is known by the employer's competitors.

*Frantz v. Johnson*, 999 P.2d 351, 358–59 (Nev. 2000).

4.    Lasala acquired an intimate knowledge of Plaintiffs' confidential information while employed as Plaintiffs' chief legal officer, including work product, financial records, corporate structure, client lists, corporate relationships, and other such sensitive information.

5.     Lasala also acquired vast amounts of Plaintiffs' confidential information pertaining to Plaintiffs' finances, legal involvement, investment performance, sales and marketing, clients and suppliers, compensation, background of management, etc., while purporting to find investors for the company.

6.     Plaintiffs' information described above was protected, and only those who were bound by confidentiality agreements were granted access thereto – not the public or competitors.

7.     Because Plaintiffs' information was extremely confidential, its secrecy guarded, it was not readily available within the industry, and Defendants knew it was subject to non-disclosure agreements, it qualifies as a trade secret.

8.     Lasala misappropriated Plaintiffs' trade secret information by utilizing and retaining such information in order to help establish a competing business with the same business model as Plaintiffs (CHA), and by soliciting Plaintiffs' employees and business contacts.

9.     Lasala breached his fiduciary duties owed to Plaintiffs.

10.     In order to plead a cause of action for breach of fiduciary duty, there must be shown the existence of a fiduciary relationship, its breach, and damage proximately caused by that breach. *Klein v. Freedom Strategic Partners, LLC*, 595 F. Supp. 2d 1152, 1162 (D. Nev. 2009).   Additionally, "[c]onstructive fraud is characterized by a breach of duty arising out of a fiduciary or confidential relationship."   *Perry v. Jordan*, 900 P.2d 335, 337 (Nev. 1995) (quoting *Long v. Towne*, 639 P.2d 528, 529–30 (Nev. 1982)).

11.     Under Nevada law, a fiduciary duty exists between an employee and the company, which is the "highest duty of fidelity, loyalty and honesty in the performance of the duties by the agent on behalf of the principal."   *LeMon v. Landers*, 402 P.2d 648, 649 (Nev. 1965).   An employee, as an agent of the company, owes "a duty to use reasonable efforts to

give his principal information which is relevant to affairs entrusted to him." *White Cap. Indus., Inc. v. Ruppert*, 67 P.3d 318, 319 (Nev. 2003); *see also* Restatement (Second) Of Agency, 387 (1988).

12.     A fiduciary relationship also exists "between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Stalk v. Mushkin*, 199 P.3d 838, 843 (Nev. 2009) (quoting Restatement (Second) of Torts § 874 cmt. a (1979)).

13.     As Plaintiffs' attorney, Lasala owed Plaintiffs "an undivided duty of loyalty." *Moroni Corporate Investments Int'l, Inc. v. Edgemon*, Case No. 57407, 2012 WL 5378151 (Nev. Oct. 31, 2012) (attorney failed to disclose to his client his financial interests in a transaction he was orchestrating).

14.     The Nevada Supreme Court has recognized that a "duty to speak does not necessarily depend on the existence of a fiduciary relationship.  It may arise in *any* situation where one party imposes confidence in the other because of that person's position, and the other party knows of this confidence." *Perry*, 900 P.2d at 337.  Said confidential relationship exists when one "reposes a special confidence in another so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing the confidence." *Id*. (quoting *Long*, 639 P.2d at 529–30).

15.     By reason of Lasala's position as Plaintiffs' employee, agent, and attorney, Lasala owed Plaintiffs fiduciary duties of good faith, loyalty, fair dealing, and candor as well as a duty not to disclose Plaintiffs' confidential information or to use that information to Plaintiffs' disadvantage.

16.     Because of these positions, Lasala had knowledge of material nonpublic information regarding the company, including Plaintiffs' work product, trade secrets, client lists, corporate relationships, and other such sensitive information.

17. Plaintiffs entrusted Lasala to maintain Plaintiffs' confidentiality, and Lasala was aware of the confidence placed in him by Plaintiffs.

18. Lasala owed a duty to act in good faith toward Plaintiffs, which encompassed a duty to speak when Plaintiffs' best interests were compromised.

19. Lasala did not abide by his fiduciary duties, choosing instead to utilize Plaintiffs' confidential and proprietary information to usurp Plaintiffs' corporate opportunities, establish a competing business, and solicit Plaintiffs' clients and investors all to Plaintiffs' detriment.

20. Lasala never disclosed to Plaintiffs his competing financial interests in collaborating with one of Plaintiffs' potential investors while still acting as Plaintiffs' agent and attorney.

21. As an employee, agent, and attorney, Plaintiffs, Lasala clearly violated his fiduciary and confidential duties owed to Plaintiffs.

22. Lasala is also liable for breach of contract and breach of implied covenant of good faith and fair dealing.

23. In order to prevail on a claim for breach of contract, the following elements must be established: "(1) the existence of a valid contract; (2) a breach by the defendant; and, (3) damage as a result of the breach." *Saini v. Int'l Game Tech.*, 434 F. Supp. 2d 913, 919–20 (D. Nev. 2006) (citing *Richardson v. Jones*, 1 Nev. 405, 405 (1865)).

24. Similarly, "[i]t is well established within Nevada that every contract imposes upon the contracting parties the duty of good faith and fair dealing." *Hilton Hotels Corp. v. Butch Lewis Prods., Inc.*, 862 P.2d 1207, 1209 (Nev. 1993). Thus, in order to recover on a contractual breach of the implied covenant of good faith and fair dealing theory in Nevada, Plaintiffs would have had to show that their reasonable or justified expectations under the contract were denied. *Perry*, 900 P.2d at 338; *see also Hilton Hotels Corp.*, 808 P.2d at 922–23. The Nevada Supreme Court has provided that "[w]hen one party performs a contract in a

manner that is unfaithful to the purpose of the contract and the justified expectations of the other party are thus denied, damages may be awarded against the party who does not act in good faith." *Hilton Hotels Corp.*, 808 P.2d at 923.

25.     Plaintiffs reasonably expected that Lasala would not disclose or use Plaintiffs' confidential information for any other purpose than for representing Plaintiffs in discussions on possible transactions for Plaintiffs.  Plaintiffs reasonably expected that the Lasala would not solicit its employees.     However, Lasala did both, thus his performance under the Confidentiality Agreement was unfaithful to the purpose of the Confidentiality Agreement.

26.     Plaintiffs' expectations were justified under the Confidentiality Agreement and Lasala is liable for breach of contract as to the Employee Manual and breach of the covenant of good faith and fair dealing.[5]

27.     Lasala is liable for fraudulent concealment.

28.     To establish a prima facie case of fraudulent concealment under Nevada Law, a plaintiff must offer proof that satisfies five elements: (1) the defendant concealed or suppressed a material fact; (2) the defendant was under a duty to disclose the fact to the plaintiff; (3) the defendant intentionally concealed or suppressed the fact with the intent to defraud the plaintiff; that is, the defendant concealed or suppressed the fact for the purpose of inducing the plaintiff to act differently than she would have if she had known the fact; (4) the plaintiff was unaware of the fact and would have acted differently if she had known of the concealed or suppressed fact; (5) and, as a result of the concealment or suppression of the fact, the plaintiff sustained damages. *Lasao v. Stearns Lending Co.*, Case No. 2:10-CV-01864-KJD-LRL, 2011 WL 3273923, at *6 (D. Nev. July 29, 2011).

29.     Lasala concealed that he was conspiring to form a competing business through

---

[5] The Court does not find that Lasala is in breach of the Operating Agreement because he was not a member to the Operating Agreement. (*See supra* Findings of Fact ¶ 9).

the use of Plaintiffs' confidential proprietary information.  By way of his fiduciary relationship with Plaintiffs, Lasala was under a duty to disclose any intended purpose in obtaining and retaining Plaintiffs' confidential proprietary information.

30.     Lasala intentionally concealed and/or suppressed his true intent to defraud Plaintiffs and induce Plaintiffs to entrust Lasala with said proprietary information.

31.     Plaintiffs were unaware of the fact that Lasala was conspiring to form a competing business through the use of Plaintiffs' confidential proprietary information.

32.     Plaintiffs suffered damages due to the creation of CHA and were compelled to initiate the instant lawsuit to get this matter resolved.

33.     Lasala is liable for conversion.

34.     Conversion is "a distinct act of dominion wrongfully exerted over another's personal property in denial of, or inconsistent with his title or rights therein *or* in derogation, exclusion, or defiance of such title or rights." *M.C. Multi-Family Dev., LLC v. Crestdale Assocs., Ltd.*, 193 P.3d 536, 542 (Nev. 2008).

35.     Lasala committed a distinct act of wrongful dominion over Plaintiffs' property when he removed, retained and utilized Plaintiffs' confidential work product, trade secrets, client lists, corporate relationships and other such sensitive information, through his confidential relationships with Plaintiffs.

36.     The acts committed by Lasala acts were done in denial of Plaintiffs' exclusive rights to the stolen sensitive information.

37.     Lasala acted in a manner inconsistent with the Lasala's non-existent rights in the stolen information.

38.     Lasala's acts were done in actual defiance of various confidentiality requirements and fiduciary duties in place between Plaintiffs and Lasala.

39.     Plaintiffs suffered damages due to the creation of CHA and were compelled to

initiate the instant lawsuit to get this matter resolved.

40.    Plaintiffs' damages have been limited due to the Cornwall agreeing to destroy Plaintiffs' confidential information.

41.    Additionally, the actions of Lasala were willful, wanton and malicious, entitling Plaintiffs to an award of punitive damages against Lasala.

## **CONCLUSION**

Accordingly, for good cause appearing, the Court hereby rules as follows:

**IT IS HEREBY ORDERED** that judgment is entered in favor of Plaintiffs and against Lasala with respect to the claims asserted in Plaintiffs' complaint and addressed herein, namely for breach of fiduciary duty, breach of confidential relationship/constructive fraud, breach of contract as to the Employee Manual, breach of the covenant of good faith and fair dealing, unjust enrichment, fraudulent concealment, conversion, misappropriation of trade secrets, and injunctive relief.  All remaining claims are dismissed against Lasala.

///

///

///

///

///

///

///

///

///

///

**IT IS FURTHER ORDERED** that Plaintiffs must seek attorneys' fees and costs in a separate motion. (*See* D. Nev. LR 54-14) (describing the process for motions for attorney's fees, which "must be filed with the court and served within 14 days after entry of the final Judgment"); (*see also* D. Nev. LR 54-1) ("A prevailing party who claims costs must file and serve a bill of costs and disbursements on the form provided by the clerk no later than 14 days after the date of entry of the judgment or decree. *See* 28 U.S.C. §§ 1920, 1921, and 1923; Fed. R. Civ. P. 54(d)(1).").  The Court will not opine on the appropriateness of attorneys' fees at this time.  Because Plaintiffs seek three times the amount of attorneys' fees as punitive damages, the Court reserves its ruling on the amount of punitive damages.

The Clerk of Court shall enter judgment accordingly and close the case.

**DATED** this __29__ day of September, 2017.

_____
Gloria M. Navarro, Chief Judge
United States District Court